JUSTICE REGNIER
delivered the opinion of the Court.
¶1 The Durdens filed this action against Chief Industries, Incorporated and Hydro Flame Corporation in the Sixth Judicial District Court, Park County, to recover damages for injuries sustained while inhabiting a fifth-wheel trailer manufactured and sold by Chief Industries and heated by a furnace manufactured by Hydro Flame. Chief Industries and Hydro Flame filed cross-claims against each other seeking indemnification from the other in the instance either was found liable. Prior to trial the Durdens and Hydro Flame reached a court-approved settlement and the District Court dismissed both *320 cross-claims with prejudice. Following a trial between the Durdens and Chief Industries, an appeal resulting in Durden v. Hydro Flame Corporation, 1998 MT 47, 288 Mont. 1, 955 P.2d 160, and remand, Chief Industries sought to have its indemnity cross-claim reinstated. The District Court refused and certified its order as a final judgment pursuant to Rule 54(b), M.R.Civ.P. Chief Industries appeals.
¶2 The sole issue raised on appeal is whether, in a product liability action in which the finished product manufacturer and a component part manufacturer are named defendants, the rights of the finished product manufacturer to indemnity against the component manufacturer are extinguished upon the latter’s settlement with the injured party.
PROCEDURAL AND FACTUAL BACKGROUND
¶3 The Durdens filed this action against Chief Industries to recover damages for carbon monoxide poisoning they allegedly sustained while inhabiting a fifth-wheel trailer manufactured and sold by Chief Industries. The Durden’s complaint was also filed against Hydro Flame Corporation, the manufacturer of the trailer furnace which is alleged to have been the source of the carbon monoxide. Chief Industries designed and installed the duct work and exhaust for the furnace which, according to the Durdens’ expert, caused the trailer to be defective and unreasonably dangerous. The Durdens predicated each defendant’s liability upon theories of breach of warranty and strict liability in tort.
¶4 As to Hydro Flame, the Durdens’ complaint asserted that the furnace was defective as evidenced by the development of holes in the heat exchanger portion of the furnace. These holes were alleged to have allowed carbon monoxide to infiltrate the living space of the trailer. As to Chief Industries, the complaint alleged that the trailer was designed and manufactured in a defective and unreasonably dangerous condition because it incorporated a defective heating system, failed to have carbon monoxide detection devices, and failed to include adequate and complete warnings. It further alleged that Chief Industries failed to “properly inspect and test” the furnace.
¶5 Both defendants denied the allegations made in the complaint. Chief Industries filed a cross-claim against Hydro Flame by which it sought indemnity from Hydro Flame in the instance that it was found liable to the Durdens pursuant to a theory of strict liability. Hydro Flame likewise filed an indemnity cross-claim against Chief Industries. Shortly prior to trial the Durdens and Hydro Flame reached a *321 court-approved settlement and the District Court dismissed the cross-claims of both Chief Industries and Hydro Flame with prejudice.
¶6 Following a jury trial between the Durdens and Chief Industries, the District Court granted the Durdens’ motion for a directed verdict, finding that the trailer was defective, and granted a new trial on damages. The jury, nevertheless, found no causation between the defect and the Durdens’ claimed injuries.
¶7 Following an appeal, we reversed the District Court’s grant of judgment as a matter of law, but affirmed the grant of a new trial. Upon remand, Chief Industries sought to have its indemnity cross-claim reinstated by the District Court. The District Court refused and certified its order as final judgment pursuant to Rule 54(b), M.R.Civ.P. Chief Industries appeals.
STANDARD OF REVIEW
¶8 This Court, when examining the trial court’s conclusions of law, is required to “determine whether [the district court’s] interpretation of the law is correct.” Stratemeyer v. Lincoln County (1996), 276 Mont. 67, 71, 915 P.2d 175, 177. Thus, the standard of review is plenary. See Blackwell v. Lurie (1997), 284 Mont. 351, 943 P.2d 1318.
¶9 This appeal presents a practical dilemma between two competing public policies. One is the promotion of settlements, and the other is the placing of responsibility upon the “up stream” manufacturer of a defective product as opposed to the retailer or distributor of that product.
¶10 Chief Industries maintains that the latter policy, placing responsibility upon the “up stream” manufacturer of a defective product, is the more important public policy because in the context of a product liability action, a merchant should be able to claim indemnity from the “up stream” manufacturer who made a defective product sold by the merchant. Only this way, according to Chief Industries, is the party who is ultimately responsible for the defect, the party who pays for the resulting damages.
¶11 Hydro Flame, on the other hand, argues for the first policy because given the number of lawsuits filed, and the unavailability of resources and time, it is essential that lawsuits be encouraged to settle. It maintains that there would be little incentive for a manufacturer to settle with a plaintiff if it believed it still had to defend an indemnification cross-claim from a “downstream” retailer or distributor.
*322 ¶12 In State, ex rel., Deere & Co. v. District Court of the Fifth Judicial District (1986), 224 Mont. 384, 730 P.2d 396, we considered a settlement between a plaintiff and one of two defendants, and determined that when one defendant in a negligence action settles with the plaintiff it can “buy peace” from not only the plaintiff, but from the other defendants who seek damages in contribution or indemnity, or both, by way of cross-claim. Deere involved negligence, strict liability, contribution, and indemnity. In our decision in Deere, we relied upon the language of § 27-1-703, MCA, which concerns negligence, multiple defendants, joint and several liability, and contribution.
¶13 This action, on the other hand, is brought pursuant to § 27-1-719, MCA, as it existed in 1994. That statute indicates that principles of comparative negligence shall be applicable concerning named defendants; however, notably absent is any mention of multiple defendants or any reference to § 27-1-703, MCA. Section 27-1-703, MCA, is by it its terms limited to negligence actions and does not mention actions in strict liability.
¶14 Deere involved a negligence action against the operator of a bulldozer that backed into the plaintiff. The plaintiff also brought suit against the manufacturer of the bulldozer. The manufacturer settled with the plaintiff. The operator sought contribution and indemnity from the manufacturer. We held that a “joint tortfeasor who settles with the claimant before judgment on the claim is entered in a district court is not subject to claims for contribution or indemnity from the nonsettling joint tortfeasors,” Deere, 224 Mont. at 392, 730 P.2d at 402.
¶ 15 Chief Industries is correct when it notes that because this case sounds in strict liability and not negligence, § 27-1-703, MCA, does not directly apply to this case. However, the policy statements made in Deere with regard to the promotion of settlements in cases in which indemnity is involved, do offer some guidance.
¶ 16 We recognize the importance of Chief Industries’ public policy argument that a judicial system which places liability for injuries from defective products on the manufacturer of the defective product, provides protection for Montana’s consuming public and also serves to prevent the inequity of requiring a retailer or distributor to bear the cost of injury created by a manufacturer. We also recognize that a judicial system which allows individual litigants to settle with one defendant in a multiple defendant case conflicts with the rationale for allowing strict liability against “downstream” parties (without *323 proof of fault) in order to allow them to act as a conduit to pass liability “upstream” to the manufacturer of the defective product. It is clear that Montana adopted strict product liability in order to place responsibility upon the manufacturers of defective products. See Brandenburger v. Toyota Motor Sales U.S.A., Inc. (1973), 162 Mont. 506, 514, 513 P.2d 268, 273.
¶17 In order to allow “downstream” parties to “act as the conduit through which liability may flow to reach the manufacturer,” a Montana federal court allowed cross-claims and third-party complaints for indemnification against a manufacturer. See Jones v. Aero-Chem Corp. (D. Mont. 1987), 680 F.Supp. 338, 339. That court stated:
This “upstream” indemnification fosters the policy behind strict products liability by placing final responsibility for injuries caused by a defective product upon the entity initially responsible for placing that product into the stream of commerce.
Jones, 680 F.Supp. at 340. It further stated that “[t]he persons or entities on the chain of distribution of a defective product can be an efficient ’’conduit" for the imposition of liability on a manufacturer only if they in turn are allowed to seek indemnification from the manufacturer." Jones, 680 F.Supp. at 340. This policy fosters the desire to place responsibility for injury caused by a defective product on the manufacturer of that product and helps prevent inequitable imposition of liability on “downstream” parties.
¶ 18 Chief Industries claims that in the absence of imposition of liability on the “upstream” manufacturer, the manufacturer would have little economic incentive to remove a defective product from the market. It argues that the retailer or distributor could always refuse to order that product in the future, but the economic effect on the manufacturer of the loss of these few sales would be extremely limited and have little impact. Finally, Chief Industries maintains that without indemnification, the retailer or distributor might also suffer financial disaster merely because it unknowingly sold a defective product. Indemnity shifts full responsibilities for injury to the manufacturer and provides an incentive to the manufacturer to withdraw or correct the defective product.
¶ 19 The conflicting public interest presented in this case, however, is that of the encouragement of settlements as we discussed within the context of negligence in Deere. In Deere we held that a joint tortfeasor who settles with the claimant before judgment on the claim is *324 entered in a district court, is not subject to claims for contribution or indemnity from the nonsettling joint tortfeasors against whom judgment may be rendered. See Deere, 224 Mont. at 392, 730 P.2d at 402. This is so even though § 27-1-703, MCA, states that the trier of fact is to determine the degree of negligence among each of the joint tortfeasors. Actual recovery is allowed only against those tortfeasors who have not settled with the claimant.
¶20 The policy reasons for encouraging settlements and avoiding unnecessary litigation are numerous. Settlements may reduce litigants’ costs by the elimination of litigation expenses and the risk of an extreme verdict. Settlements eliminate the stress associated with trials. The public may see a reduction in the costs associated with litigation, and a more efficient and timely judicial system. Public policy is served by allowing a litigant to buy his or her peace and terminate his or her involvement in litigation. As observed by this Court nearly seventy years ago:
The law favors compromises. This is especially true in tort actions, not only because they relieve the labors of courts, and avoid expense, but also because, where the parties agree between themselves upon a settlement of the claim, the result reached is frequently a more equitable adjustment than is possible to be had in a court of law.
Black v. Martin (1930), 88 Mont. 256, 269-70, 292 P. 577, 581.
¶21 Although Chief Industries contends that Deere is inapposite to this case as its cross-claim is not based upon negligence, but rather upon strict liability, we note that our holding in Deere was not so limited. In Deere, we framed the principal issue as follows:
The principal issue we decide here is that a joint tortfeasor who settles with the claimant before judgment on the claim is entered in a district court is not subject to claims for contribution or indemnity from the nonsettling joint tortfeasors.
Deere, 224 Mont. at 386, 730 P.2d at 398. This statement of a common law principle is not as limited as Chief Industries contends. Given the facts of this case, distinctions which Chief Industries attempts to draw, even if appropriate, do not compel a different result.
¶22 The Durdens pled their case, prepared their case, and tried their case as if Hydro Flame and Chief Industries were joint tortfeasors, not as if Chief Industries’ liability was predicated solely upon its status as a “seller” pursuant to § 27-1-719, MCA. Because the injury allegedly suffered by the Durdens was carbon monoxide poisoning *325 and the poisoning could have come about from either or both Hydro Flame’s product failure or Chief Industries’ misinstallation of Hydro Flame’s product, then “as a practical matter they both are to blame.” Deere, 224 Mont., at 398, 730 P.2d at 405. The Durdens’ presented trial testimony that there were several defects, that each defect was uniquely traceable to an identified defendant, and that each defect could cause carbon monoxide infiltration. Each, therefore, is alleged to be a joint tort-feasor in strict liability. InDeere we broadly stated:
We discuss first the effect of a prejudgment settlement by one or more joint tortfeasors with a plaintiff on the rights to contribution or indemnity of the remaining nonsettling joint tortfeasors.
Deere, 224 Mont. at 387, 730 P.2d at 399.
¶23 As with § 27-1-703, MCA, confusion reigned at the time we announced our decision in Deere as to whether, despite the provision in the statute allowing the trier of fact to determine the degree of negligence among each joint tortfeasor, the right of a settling tortfeasor to be free from claims of contribution or indemnity from nonsettling tortfeasors was derived from common law principles, and not from anything set forth in the statute. In Deere we noted that in Kussler v. Burlington Northern, Inc. (1980), 186 Mont. 82, 606 P.2d 520, we adopted the rule of the Restatement (Second) of Torts, § 885 (1985) which established that the release of one joint tortfeasor is not a release of any other joint tortfeasors unless the document is intended to release the other tortfeasors, or the payment is full compensation, or the release expressly so provides. We stated that:
[I]n the case at bar then, following Kussler, there can be no doubt that as between the plaintiff Campbell and Deere & Company, the latter defendant is completely exonerated from any further liability for damages to Campbell. If therefore, following Deere’s compromise settlement with Campbell, Wade’s Backhoe can bring Deere & Company back into the action on a theory of contribution between joint tortfeasors, the finality of Deere’s compromise settlement is in serious question.
Deere, 224 Mont. at 392, 730 P.2d at 402.
¶24 Our resolution of the issue in Deere, thus, clearly provided that our conclusion was based on common law principles, and was not dependent on the language of § 27-1-703, MCA:
Consequently, under amended § 27-1-703, there is no right of contribution under Montana law in favor of a joint tortfeasor or tortfeasors against whom judgment for the plaintiff is entered from *326 other joint tortfeasors who have settled with the plaintiff prior to judgment. The judicial tenets that the law favors compromise and that a compromising party ought to be able to buy his peace with finality override the seeming unfairness to non-settling parties who did not participate in the compromise nor control its direction.
Deere, 224 Mont. at 393, 730 P.2d at 402.
¶25 Contribution distributes loss among joint tortfeasors by requiring each to pay his or her proportionate share based upon his or her proportion of the negligence which proximately caused the injuries. See Raisler v. Burlington Northern R.R. (1985), 219 Mont. 254, 258, 717 P.2d 535, 537. Indemnity, on the other hand, shifts the entire loss from the one who has been required to pay it to the one who should bear the loss. See Raisler, 219 Mont. at 258, 717 P.2d at 537. The right to indemnity is an equitable principle, based on the general theory that one compelled to pay for damages caused by another should be able to seek recovery from that party. See Poulsen v. Treasure State Indus. (1981), 192 Mont. 69, 82, 626 P.2d 822, 829.
¶26 In Deere, we noted that “[t]he remedies of indemnity and contribution are in theory mutually exclusive. Indemnity is an all-or-nothing proposition, representing in effect total contribution.” Deere, 224 Mont. at 398, 730 P.2d at 405. In light of that observation, it is clear from Deere that a “joint tortfeasor” who settles with the claimant is not subject to claims for contribution or indemnity from the nonsettling joint tortfeasors. Our decision is equally applicable to contribution claims in negligence cases, as it is to indemnity claims in product liability cases.
¶27 Since our adoption of strict liability in Brandenburger v. Toyota Motor Sales U.S.A. (1973), 162 Mont. 506, 513 P.2d 268, its primary objective has always been to place responsibility for injuries caused by defective products on those responsible for placing those products in the stream of commerce, not on the consumer. Moreover, the policy which led courts initially to allow strict liability claims against retailers and wholesalers of defective products was likewise to ensure maximum protection to the injured plaintiff, not out of any concern for the fair apportionment of liability between tortfeasors. As explained by the California Supreme Court in Vandermark v. Ford Motor Co. (Cal. 1964), 391 P.2d 168, the first decision extending strict liability to a retailer:
Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the over *327 all producing and marketing enterprise that should bear the cost of injuries resulting from defective products. In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff. In other cases the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer’s strict liability thus serves as an added incentive to safety. Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship.
Vandermark, 391 P.2d 171-72 (emphasis added) (citations omitted).
¶28 A system which allows indemnity claims to be maintained in product liability actions in which one of the defendants chooses to settle with the plaintiff would discourage settlements because there would be little incentive for a manufacturer to settle if it still had to defend an indemnification claim. It would also force injured consumers into protracted litigation that, due to the vagaries of our justice system and the expense of litigation, might result in an inadequate recovery or no recovery at all. Moreover, such a system would make it virtually impossible for less than all defendants to settle a case. No defendant would ever settle if it thought it could be brought back into the action and have to pay attorney fees and a potential judgment. On the other hand, by following the policy articulated in Deere, defendants who do not settle will be put at risk if other defendants settle. In the long run, this will promote settlement rather than trials.
¶29 In most instances, the consuming public has little interest in who pays for the damages caused by the use of a defective product as among the retailer, wholesaler, or manufacturer. However, in all cases, the public has a strong interest in seeing that compensation is made for the physical, emotional, and often catastrophic injuries caused by the use of a defectively made product. We agree with the District Court that this interest far outweighs any interest an individual retailer or wholesaler of a defective product might have in placing ultimate responsibility on the manufacturer.
¶30 Finally, Chief Industries asserts that the policy articulated in Deere will cause plaintiffs to settle for less than full value with manufacturers and then leave local “mom and pop” retailers to pay for an unfair amount of remaining damages. The dissent expresses the same concern. Such a view assumes that an injured plaintiff would *328 rather settle, for less than the actual damages, with an out of state defendant which manufactured a defective product and go to trial against a local business which is only secondarily liable. There is no basis in fact for such an assumption and it flies in the face of sound litigation strategy and common sense.
¶31 Accordingly, we conclude that in accordance with well established common law principles and the public policy favoring settlements, a settlement by one tortfeasor precludes claims for both contribution and indemnity against the settling tortfeasor, irrespective of the nature of the underlying tort claim.
¶32 The judgment of the District Court is affirmed.
CHIEF JUSTICE TURNAGE, JUSTICES GRAY, HUNT and TRIEWEILER concur.